# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA OIL AND GAS ASSOCIATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KENNETH L. SALAZAR, *et al.*, <br><br> Defendants. | Case No. 3:11-cv-0025-RRB |
| STATE OF ALASKA, <br><br> Plaintiff, <br><br> v. <br><br> KENNETH L. SALAZAR, *et al.*, <br><br> Defendants. | Case No. 3:11-cv-0036-RRB |
| ARCTIC SLOPE REGIONAL CORPORATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KENNETH L. SALAZAR, *et al.*, <br><br> Defendants. | Case No. 3:11-cv-0106-RRB <br><br> Order Granting Plaintiffs' Motions For Summary Judgment |

# I.    **INTRODUCTION**

Before the Court are Plaintiffs Alaska Oil and Gas Association, the American Petroleum

Institute, Arctic Slope Regional Corporation, the North Slope Borough, NANA Regional

Corporation, Inc., Bering Straits Native Corporation, Calista Corporation, Tikigaq Corporation,

Olgoonik Corporation, Inc., Ukpeagvik Inupiat Corporation, Kuukpik Corporation, Cully

Corporation, Kaktovik, Inupiat Corporation, the Inupiat Community of the Arctic Slope, and

State of Alaska with three motions for summary judgment, at Docket Numbers 50, 55, and 57,

challenging the United States Department of the Interior, Fish and Wildlife Service's ("Service")

final rule designating critical habitat for the polar bear ("Final Rule") under the Endangered

Species Act ("ESA").  As the present litigation involves three separate but closely related

summary judgment motions from three partially consolidated cases, the Court will treat all three

motions as a single motion.

Plaintiffs contend that the Service proceeded with an unprecedented critical habitat

designation despite the Service's finding that such designation "*will not result in any present or*

*anticipated future conservation benefit to the polar bear species* " and is not "'essential' to the

conservation of the species."[1]  Plaintiffs further opine that: (1) such designation will "have

significant adverse ramifications for the people who live and work on the North Slope, for

_____

[1]Docket 51 at 9 (emphasis in original).

Alaska's oil and gas industry, and for the State of Alaska";[2] (2) the designation will "leave the species worse off because it is impairing the cooperative relationship that the . . . [Service] has sought to build with the Alaska Natives";[3] (3) the Service's failure to exclude "native-owned lands and rural communities" will "disproportionately harm Alaska Natives and other North Slope Borough residents";[4] (4) the Service failed "to engage in meaningful consultation with [the State of Alaska and with] Alaska Natives early in the rulemaking process";[5] (5) the Service's inclusion of "a one-mile no disturbance zone as part of the barrier island habitat unit of the designation . . . exceeds its authority under the ESA"; [6] (6) "[t]he Service failed to adequately consider and include in the calculation of the total economic impacts of the designation the substantial indirect incremental economic impacts";[7] (7) "[t]he Service failed to provide Alaska with an adequate written justification as required by the ESA . . . for promulgating a . . . designation that conflicts with the comments submitted to the" Service;[8] (8) the Service failed to address the area exclusion requests by Alaska "and failed to adequately consider whether the

---

[2]*Id.*

[3]Docket 56 at 5.

[4]*Id.*

[5]*Id.* at 6.

[6]*Id.*

[7]Docket 58 at 9.

[8]*Id.*

3

benefits of excluding those areas were outweighed by the benefits of including them";[9] (9) "[t]he Service improperly included areas that it concedes were not occupied by polar bears at the time of the designation";[10] and (10) "[t]he Service improperly included areas as critical habitat without determining that those areas contained the physical or biological features essential to the conservation of the polar bear."[11]  Plaintiffs seek the invalidation of the Final Rule and request that the Court vacate and remand the Rule.

Defendants Kenneth L. Salazar, Secretary of the Interior, Rowan W. Gould, Acting Director of the Service, and the Service (collectively, "Government") and Defendant-Intervenors Center for Biological Diversity, Defenders of Wildlife, Inc., and Greenpeace, Inc. (collectively, "Intervenors") oppose and cross-move for summary judgment at Docket Numbers 64 and 68 respectively.[12]  The Government argues that Plaintiffs insert requirements into the ESA that simply do not appear in the Act, ignore or disagree with much of the case law that interprets the critical habitat provisions of the ESA, and ask the Court to review technical and scientific matters that Congress explicitly left to the discretion and expertise of the Service.[13]  The Government

---

[9]*Id.* at 10.

[10]*Id.*

[11]*Id.*

[12]The Court will treat the Government's and Intervenors' Oppositions / Cross-Motions as oppositions to Plaintiffs' Summary Judgment Motions.

[13]Docket 64 at 15-16.

further claims that the designation "provides many important conservation benefits for the species . . . ."[14]  Additionally, the Government contends that because the polar bear and its habitat are highly threatened by climate change, the designation of critical habitat for the species can help mitigate any further habitat degradation.[15]  Intervenors agree with the Government and state that the Final Rule "complies with the letter and intent of the ESA."[16]

**Inasmuch as the Court concludes that the Final Rule, while valid in many respects, falls short of the APA's arbitrary and capricious standard and because the Service failed to follow the procedural requirements of the ESA, the Court vacates the Final Rule and remands it to the Service.**

## II.  FACTS

These partially consolidated cases present Plaintiffs' collective challenges to the Service's ESA rulemaking designation of critical habitat for the polar bear.  The cases are subject to administrative record review under the Administrative Procedure Act ("APA").[17]  There are no contested issues of fact, and all parties agree that the cases will be decided by summary judgment

---

[14]*Id.* at 15.

[15]*Id.*

[16]Docket 68 at 6.

[17]5 U.S.C. § 706(2) (1966).

based on the administrative record.[18]

## III.     STANDARD OF REVIEW

### A.     Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should

be granted if there is no genuine dispute as to material facts and if the moving party is entitled to

judgment as a matter of law.  All evidence presented by the non-movant must be believed for

purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-

movant.[19]  A court may grant summary judgment if the motion and supporting materials show

that the movant is so entitled.[20]  The sufficiency of the evidence shown must be such that a judge

or jury is required "'to resolve the parties' differing versions of the truth at trial'"[21] because the

facts could reasonably be resolved in favor of either party.[22]

### B.     Administrative Procedure Act

Under the APA, "final agency action for which there is no other adequate remedy in a

---

[18]Docket 32 at 2-4.

[19]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[20]Fed. R. Civ. P. 56(e)(2), (3).

[21]*Anderson*, 477 U.S. at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968)).

[22]*Id.* at 250.

6

court is subject to judicial review."[23]  "[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."[24]  After a court has finished reviewing the action, the "court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law . . . ."[25]

Judicial review of agency action is limited to those actions required by law.[26]  A court cannot review agency action that Congress has left to agency discretion.[27]  Once a court is "satisfied that an agency's exercise of discretion is truly informed," a court "'must defer to th[at] informed discretion.'"[28]  Although an agency "cannot act on pure speculation or contrary to the evidence, the ESA accepts agency decisions in the face of uncertainty."[29]  Yet, "an agency must

---

[23]5 U.S.C. § 704 (1966).

[24]5 U.S.C. § 706 (1966).

[25]5 U.S.C. § 706(2)(A), (C), (D).

[26]*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64-65 (2004).

[27]*Id.*

[28]*Greenpeace Action v. Franklin,* 14 F.3d 1324, 1331-32 (9th Cir. 1992) (quoting *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 377 (1989)).

[29]*Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163-64 (9th Cir. 2010).

7

cogently explain why it has exercised its discretion in a given manner . . . ."[30]  Additionally, even

if agency decision making is discretionary, the required procedures of such decision making may

not be.[31]

"Summary judgment is an appropriate mechanism for" resolving disputes over agency

action.[32]  "[T]he function of the district court is to determine whether or not as a matter of law the

evidence in the administrative record permitted the agency to make the decision it did."[33]

However, the agency is the fact finder, not the district court.[34]

When reviewing "under the arbitrary and capricious standard[,]" a court is deferential to

the agency involved.[35]  The agency's action is to be "presum[ed] . . . valid."[36]  A court should

> not vacate an agency's decision unless it 'has relied on factors which Congress had
> not intended it to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to the evidence

---

[30]*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983).

[31]*Bennett v. Spear*, 520 U.S. 154, 172 (1997).

[32]*City & Cnty. of S. F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985)).

[33]*Id.* (quoting *Occidental Eng'g Co.*, 753 F.2d at 769).

[34]*Occidental Eng'g Co.*, 753 F.2d at 769.

[35]*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

[36]*Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)).

8

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'[37]

If an agency has not committed one of the these errors, and "'a reasonable basis exists for its decision[,]'" the action should be affirmed.[38]  But, in considering whether there is a reasonable basis for the action, a "reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"[39] A court's consideration of agency action must be "'thorough, probing, [and] in-depth . . . .'"[40] A reviewing court "'must not rubber-stamp . . . administrative decisions that [a court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'"[41]  An agency must have taken "a 'hard look' at the potential . . . impacts at issue."[42] Moreover, if the agency does not satisfactorily explain its decision, a court should not attempt

---

[37]*Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc.*, 463 U.S. at 43).

[38]*Cal. Wilderness Coal.*, 631 F.3d at 1084 (quoting *Nw. Ecosystem Alliance*, 475 F.3d at 1140).

[39]*Marsh*, 490 U.S. at 377-78 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971))

[40]*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 840-41 (9th Cir. 2003) (quoting *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1098 (D.C. Cir.1996)).

[41]*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (quoting *Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001)).

[42]*Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1126 (9th Cir. 2012) (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999)).

9

itself to make up for any deficiencies: A court may not supply a reasoned basis for the agency's action that the agency itself has not given.[43]  In other words, an "agency must set forth clearly the grounds on which it acted."[44]  Additionally, "an agency must account for evidence in the record that may dispute the agency's findings."[45]

A court must inquire whether "the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[46]  "This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'"[47]  "[A] court is not to substitute its judgment for that of the agency."[48]  "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions . . . ."[49]  Rather, a court should

---

[43] *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 42-43.

[44] *Atchison T. & S. F. Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973).

[45] *Port of Seattle, Wash. v. F.E.R.C.*, 499 F.3d 1016, 1035 (9th Cir. 2007) *(*citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).

[46] *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

[47] *Marsh,* 490 U.S. at 377-78 (quoting *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416).

[48] *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 42-43.

[49] *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citing *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)).

10

"uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."[50]

A court "is not to second guess the agency's action[, but] . . . must defer to a reasonable agency action 'even if the administrative record contains evidence for and against its decision.'"[51] The agency's action "'need only be a reasonable, not the best or most reasonable, decision.'"[52]

Deference to an agency's factual conclusions is important when the subject matter involves an agency's experts' complex scientific and technical opinions: "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."[53] However, "[t]he deference accorded an agency's scientific or technical expertise is not unlimited."[54] "The presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned."[55] A court "defer[s] to agency expertise on methodology issues, 'unless the agency has completely failed to address some factor

---

[50]*Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc.*, 463 U.S. at 43).

[51]*Modesto Irr. Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quoting *Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009)).

[52]*River Runners for Wilderness*, 593 F.3d at 1070 (quoting *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989)).

[53]*Marsh*, 490 U.S. at 377-78.

[54]*Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) (citing *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 679 (D. D.C. 1997)).

[55]*Id.* (citing *Defenders of Wildlife*, 958 F.Supp. at 679).

11

consideration of which was essential to [making an] informed decision.'"[56]

"Unlike substantive challenges [under the arbitrary and capricious standard, a court's] review of an agency's *procedural compliance* is exacting, yet limited."[57] A court is limited to ensuring that statutorily prescribed procedures have been followed, including determining the adequacy of the agency's notice and comment procedure, without deferring to an agency's own opinion of the opportunities it provided.[58] Indeed, "'regulations subject to the APA cannot be afforded the force and effect of law if not promulgated pursuant to the statutory procedural minimum found in that Act.'"[59]

## IV.  DISCUSSION

### A.  The Service's designation is not overbroad.

Plaintiffs argue that the Service acted contrary to congressional intent when the Service designated "virtually all of the U.S. range of the polar bear."[60] "[W]hen the statutory language is

---

[56]*Id.* (quoting *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir.1993)).

[57]*Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1075-76 (9th Cir. 2006) (emphasis added) (quoting *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1045, 1048-49 (D.C. Cir. 1979)).

[58]*Id. (*quoting *Natural Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002)).

[59]*Western Oil & Gas Ass'n v. U.S. EPA*, 633 F.2d 803, 812-13 (9th Cir. 1980) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979)).

[60]Docket 51 at 23.

12

plain, we must enforce it according to its terms"[61]  Under 16 U.S.C. § 1532(5)(C),"critical habitat

shall not include the *entire* geographical area which can be occupied by the" species.[62]

Congress's intent is clear.  The Service did not designate the *entire* area that could be occupied

by the polar bear.  The Service left out "those U.S. waters north of the 300-meter depth boundary

in the Beaufort Sea[,][63] . . . [some] areas on the North Slope of Alaska that polar bears use for

denning[, and] . . . any denning habitat on the West coast of Alaska or west of the town of

Barrow . . . ."[64]  "Entire" does not mean virtually all; it means *all*.  The Service did not designate

all of the potential polar bear geographical area.  Thus, the Service's action did not violate the

APA.

**B.    The Service's labeling the entire designation as "occupied" is lawful**.

Plaintiffs contend that "[t]he Service violated the ESA by concluding that certain

geographic areas were occupied by the polar bear at the time of listing without *sufficient* evidence

of polar bear occurrence in these areas to show the species is likely to be present during any

reasonable span of time."[65]  The Court disagrees.

Under the ESA, critical habitat can be composed of areas either occupied or unoccupied

---

[61]*Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).

[62]Emphasis added.

[63]Administrative Record Index ("ARI") PBCH004587, PBCH0045491.

[64]ARI PBCH0045514-16, PBCH0047384, PBCH0047392, PBCH0045489.

[65]Docket 58 at 42.

13

by the listed species.[66]  Designation of unoccupied areas requires a more rigorous justification

from the Service than does the designation of occupied areas.[67]  However, the word "occupied"

has not been defined by Congress.[68]  When ambiguity arises in applying the ESA, the Supreme

Court has determined that the Service's "'reasonable interpretation' of the statutory scheme" is

owed a degree of deference.[69]  Still, "such deference is appropriate only where 'Congress has not

directly addressed the precise question at issue' through the statutory text."[70]  Thus, where

Congress has not addressed statutory ambiguity, a court must establish "whether the agency's

answer is based on a permissible construction of the statute."[71]

Here, the Service defined "occupied" regions  "as 'areas that the [species] uses with

sufficient regularity that it is likely to be present during any reasonable span of time."[72]  The

Ninth Circuit has held that such definition is reasonable.[73]  In light of the Ninth Circuit's

---

[66]*Ariz. Cattle Growers' Ass'n*,  606 F.3d at 1163-64.

[67]*Id.*

[68]*Id.* at 1164.

[69]*Nat'l Ass'n of Home Builders*, 551 U.S. at 665-66 (quoting *Babbitt v. Sweet Home Chapter, Communities for Great Ore.*, 515 U.S. 687, 703 (1995)).

[70]*Id.* (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

[71]*Id.* (quoting *Chevron U.S.A. Inc.*, 467 U.S. at 843).

[72]ARI PBCH0035658-59.

[73]*Ariz. Cattle Growers' Ass'n*,  606 F.3d at 1165.

14

acceptance and after the Court's independent review, the Service's definition of the term "occupied" is a permissible construction of the ESA.

With the Service's definition of "occupied," the Court turns to the sufficiency of the evidence to establish that polar bears occupied the areas in question at the time of listing. The Service shall make determinations required by the ESA "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species."[74] Determining a species' frequency of use of an area "is a highly contextual and fact-dependent inquiry [that is] . . . within the purview of the agency's unique expertise and [is] entitled to the standard deference afforded such agency determinations."[75] Additionally, in those areas "where habitat is used on a sporadic basis, allowing the . . . [Service] to designate as 'occupied' habitat where the species is *likely to be found* promotes the ESA's conservation goals and comports with the ESA's policy of 'institutionalized caution.'"[76] Yet, "there is no evidence that Congress intended to allow the . . . Service to regulate any parcel of land that is *merely capable* of supporting a protected species."[77] An "agency may not determine that areas unused by [a

---

[74]16 U.S.C. § 1533(b)(1)(A) (2003).

[75]*Id.* at 1165.

[76]*Id.* at 1167 (emphasis added).

[77]*Ariz. Cattle Growers' Ass'n,* 273 F.3d at 1244 (emphasis added).

Case 3:11-cv-00025-RRB   Document 96   Filed 01/11/13   Page 15 of 50

species] are occupied merely because those areas are suitable for future occupancy."[78]

Here, Plaintiffs attack the Service's evidence of "occupied" areas as old, sporadic sightings that do not show that polar bears existed in the areas at the time of listing in 2008.[79] The Service's justification for categorizing as "occupied" those areas "south and east of St. Lawrence Island, including Norton Sound down to Hooper Bay" is based on a myriad of information that, although antiquated, shows that polar bears resided in those areas in the past and were *likely to be found* there in 2008, thus, falling within the accepted definition of "occupied."[80]  Deciding whether such areas were occupied or not at the time of listing falls under the Service's unique expertise and deserves this Court's deference.  With the presumption of validity that is attached to all agency actions, and in light of the dearth of opposing or unconsidered record evidence presented by Plaintiffs, the Court must respect the Service's contention that it used the best scientific and commercial data available.  The Service must rely only on *available* data, and Plaintiffs have not shown that any more recent or concrete data exists that disputes that polar bears were likely to be found in the areas in question at the time of listing. Therefore, the Service's categorization as "occupied" of such areas is reasonable under the APA.

C.    **Inclusion of the sea ice primary constituent element is rational**.

---

[78]*Ariz. Cattle Growers' Ass'n*,  606 F.3d at 1167.

[79]Docket 79 at 25-26.

[80]ARI PBCH0045556, PBCH0047389-90, PBCH0047544, PBCH0049037, PBCH0049039, PBCH0049554, PBCH0045483.

16

Plaintiffs argue that because "[t]he Service failed to adequately explain and substantiate its reasoning" defining the sea ice primary constituent element ("PCE"), the inclusion of the sea ice area, Unit 1, in the designation is unlawful.[81] Plaintiffs misinterpret the record evidence.

It is clear from even a cursory reading of the record that the Service has established a rational connection between the facts supporting the inclusion of the sea ice area in the designation and the Final Rule. Where Plaintiffs contend that polar bears select their sea ice habitat based on *three* characteristics, the record lists only *two*:

> (1) sea-ice concentrations approximately 50 percent or greater that are adjacent to open water areas, leads, polynyas, and that are over the shallower, more productive waters over the continental shelf (waters 300 m (984.2 ft) or less in depth); and (2) flaw zones that are over the shallower, more productive waters over the continental shelf (waters 300 m (984.2 ft) or less in depth).[82]

Furthermore, whereas the Final Rule defined the other two PCEs as being comprised of multiple components or features, the sea ice PCE has merely one feature: Sea ice over waters 300 m (984.2 ft) or less in depth that occurs over the continental shelf with adequate prey resources to support polar bears.[83] Plaintiffs claim that the single feature definition of the sea ice PCE cannot

---

[81]Docket 58 at 50.

[82]ARI PBCH0045506.

[83]ARI PBCH0045510.

be reconciled with the multiple-characteristic explanation in the record.[84]  However, "by defining the sea-ice PCE as . . . 'sea ice over waters 300 m (984.2 ft) or less in depth that occurs over the continental shelf . . .[,]' the Service captured *both* of the characteristics" defined by the record.[85] Therefore, due to the rational connection between the facts in the record and the Service's action, and in light of the deference provided to the Service's scientific and technical expertise, the Court finds the Service's inclusion of the sea ice PCE, found in Unit 1, to be valid and not in violation of the APA.

**D.  The Service shows special management considerations or protection may be required.**

Plaintiffs argue that: (1) "[t]he Service has not demonstrated that any special measures may be required";[86] and (2) "[t]he Service unlawfully failed to reconcile its directly contradictory findings."[87]  The ease with which the special-management-considerations-or-protection requirement can be satisfied almost renders such requirement nonexistent.  Nonetheless, the Service satisfies the low legal standard.[86]

---

[84]Docket 58 at 50.

[85]Docket 64 at 53 (quoting PBCH0045506) (emphasis added).

[86]Docket 51 at 33.

[87]Docket 77 at 23.

[86]Because the Court has determined that the Service failed to adequately show the existence of physical or biological features in Units 2 and 3, the Court will focus solely on Unit 1 in analyzing the fulfilment of the special-management-considerations-or-protection requirement.

18

In addition to establishing that areas designated as a critical habitat contain physical or biological features essential to the conservation of the species, the Service must also show that such features "*may* require *special management considerations or protection*."[87] "'Special management considerations or protection' means any methods or procedures *useful* in protecting physical and biological features of the environment for the conservation of listed species."[88]

The word "may" connotes possibility.[89] Areas that satisfy the ESA's critical habitat requirements are lands "for which special management or protection *is possible*."[91] "So long as they are useful in protecting a listed species' habitat, any and every method or procedure qualifies as a special management consideration or protection."[92] Moreover, an agency can "look to past activities to determine the likelihood of future events."[93]

The Service devotes approximately three pages of the Final Rule to explaining the potential special management considerations or protection for the PCEs.[94] Specifically, the

---

[87] 16 U.S.C. § 1532(5)(A)(i) (emphasis added).

[88] 50 C.F.R. § 424.02(j) (1980) (emphasis added) (internal quotation marks in original).

[89] *Ctr. for Biological Diversity v. Norton*, 240 F.Supp.2d 1090, 1098-99 (D. Ariz. 2003) (quoting *The Concise Oxford Dictionary of Current English* (9th ed. 1995)).

[91] *Id.* (emphasis added).

[92] *Id.* at 1099.

[93] *Ariz. Cattle Growers' Ass'n v. Kempthorne,* 534 F.Supp.2d 1013, 1031( D. Ariz. 2008).

[94] ARI PBCH0045510-14.

Service lists the following as "[p]otential impacts that could harm the identified essential physical and biological features": reductions in the extent of the arctic sea ice due to climate change; oil and gas exploration, development, and production; human disturbance; and commercial shipping.[95]  After examining the Service's evidence in support of the possible threats to the PCEs, the Court is satisfied that the Service has made a rational connection between the facts found in the record and the choices made by the Service in establishing that special considerations or protection *may* be required to fend off such threats.

Because the emphasis in the requirement is on the word "may," the evidence shown by the Service supports the reasonable conclusion that *some* special management considerations or protection may be needed in the future to protect the sea ice habitat PCE.  However, neither the Service nor the ESA have to be the vehicles by which the procedures or actions involved in the considerations or protection are accomplished.  The Service has shown that some day, not necessarily at this time, such considerations or protection *may* be required.  In other words, the Service has shown that it is within the realm of possibility that such considerations or protection may be needed now or in the future.  Furthermore, the Service does not have to identify the source of such considerations or protection, merely that the considerations or protection may be necessary in the future.  For example, the evidence in the record showing that sea ice is melting and that it will continue to melt in the future, perhaps at an accelerated rate, is more than enough

---

[95]ARI PBCH0045510.

proof that protection *may* be needed at some point.

Additionally, the Service did not fail to address any contradictory findings, as argued by the Plaintiffs, because there were none. Plaintiffs contend that because there are currently no regulations that effectively address global warming, the Service cannot determine that the sea ice habitat PCE *may* require special considerations or protection at some point in the future.[96] Such evidence of a lack of effective global warming regulation now or in the future does not foreclose the potential future *need* of such regulations to protect the melting sea ice. Science is forever changing, and today's scientific methods and procedures could change tomorrow. Just because global warming seems to be unanswerable now does not remove a potential solution to the problem from the vast space of possibility within which lies the special-management-considerations-or-protection requirement. Therefore, the Service successfully shows that the sea ice habitat PCE *may* require special management considerations or protection now or in the future and does not violate the APA.

### E. The Service considered all potential economic impacts.

Plaintiffs claim that the Service failed to correctly consider all of the economic impacts of the critical habitat designation as required by 16 U.S.C. § 1533(b)(2).[97] Yet, the record clearly shows that the Service did *consider* all such impacts.

_____

[96] Docket 77 at 22-23.

[97] Docket 58 at 16.

21

Under 16 U.S.C. § 1533(b)(2), the Service shall designate critical habitat on the basis of the best scientific data available and after taking into consideration the *economic impact*, the impact on national security, and any other relevant impact. The Service "shall identify any significant activities that would either affect an area considered for designation . . . or be likely to be affected by the designation, and shall, after proposing designation of such an area, consider the *probable* economic and other impacts of the designation upon *proposed* or *ongoing* activities."[98] Although Congress has turned over the analysis of the impacts cutting in favor or against critical habitat designation to the discretion of the Service, the Service is still required to show that in arriving at its decision, it took into consideration the economic and other relevant impacts.[99] Specifically, the Service must consider "economic impact[s] *before* the designation of critical habitat."[100] However, "'[a]gencies must consider only those indirect effects that are reasonably foreseeable. They need not consider potential effects that are highly speculative or indefinite.'"[101]

The Service determined that, under the baseline approach, the total incremental economic

---

[98]50 CFR § 424.19 (2005) (emphasis added).

[99]*Bennett*, 520 U.S. at 172 (quoting 16 U.S.C. § 1533(b)(2) (2003)).

[100]*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 616 F.3d 983, 991-92 (9th Cir. 2010) (citing 16 U.S.C. § 1533(b)(2)).

[101]*Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998) (quoting *Sierra Club v. Marsh*, 976 F.2d 763, 768 (1st Cir. 1992)).

impacts of the critical habitat designation were limited to direct administrative costs of new and reinitiated Section 7 consultations.[102]  The Service concluded that the total potential incremental economic impact from the designation over the next thirty years would range from $677,000.00 ($54,000.00 annualized) to $1,210,000.00 ($97,500.00 annualized) in present value terms using a seven percent discount rate.[103]  If a three percent discount rate is used, the amounts range from $1,080,000.00 ($55,100.00 annualized) to $1,960,000.00 ($100,000.00 annualized).[104]  Like the standard required for establishing that PCEs may necessitate special management considerations or protection, the legal hurdle regarding the Service's analysis of the economic impacts of designation is fairly low.  The Service must show only that it *considered* all potential economic impacts of the designation.[105]

---

[102]ARI PBCH0041546.  The parties recognize that Ninth Circuit precedent has established that the economic impacts of the critical habitat designation should be determined according to the baseline approach.  Under this approach, any economic impacts of protecting the species that will occur regardless of the critical habitat designation are treated as part of the regulatory "baseline" and are not factored into the economic analysis of the effects of the critical habitat designation.  *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1172-74.  Docket 77 at 27 n. 17 (Alaska Oil and Gas Association and The American Petroleum Institute, recognition); Docket 79 at 11, 13-14 (State of Alaska, recognition of controlling law, but preservation of the issue for appropriate resolution to address the split in authority); Docket 64 at 77 (United States, recognition).  Intervenors and the Alaska Native corporations, villages, and communities are silent on the matter.

[103]ARI PBCH0045521-22.

[104]ARI PBCH0041504.

[105]50 C.F.R. § 424.19.

23

Here, it is clear that the Service considered all of the potential economic impacts of the designation. The Service took all of the direct and indirect incremental cost analysis provided by the parties affected by the designation and, in conjunction with the cost analysis provided by its own experts, broke down the costs into those that were reasonably likely to occur and those that were uncertain or speculative.[106] Those costs that were likely to occur were included in the Final Economic Analysis and later incorporated into the Economic Analysis section of the Final Rule, which culminated in the total potential incremental economic impact in the areas included within the designation.[107] However, those costs that were uncertain or speculative, although still considered, were not included in the total potential incremental economic impact.[108] The uncertain costs were deemed unquantifiable by the Service and were dealt with on a qualitative level in the Draft Economic Analysis ("DEA"), included by reference throughout the Final Rule.

Plaintiffs primarily take issue with the non-inclusion of the indirect incremental costs that the Service deemed too uncertain to include in the total-economic-impact calculation.[109] While it is arguably misleading for the Service to represent that the *total potential* incremental cost of the designation actually includes a complete picture of *all* the costs that could be incurred as a result

---

[106]*See* ARI PBCH0045498-502.

[107]ARI PBCH0045521-22.

[108]*Id.*; ARI PBCE0045498-502.

[109]Docket 79 at 11-12.

24

of the designation, the statute and regulation merely state that the Service must solely *consider* all such costs.[110]  The Service then has complete discretion over the application of such analysis vis-à-vis critical habitat designation.[111]  It is evident from reading the record that the Service at least generally, if not specifically, considered all the incremental costs presented to it by the various parties.  The ESA does not require, and this Court cannot force, the Service to use such incremental cost analysis in a specific manner even when, as here, the way in which the analysis was used is far from ideal or even the most reasonable.  With regard to future direct administrative costs to be incurred through Section 7 consultation, the Court will defer to the Service's technical expertise in its cost projections.

Because the Service must only *consider* the economic data provided to it by the parties, Plaintiffs' best-available-scientific-data argument falls short.  The Service considered all the economic evidence provided by Plaintiffs and other sources.  Thus, the Service *considered all* possible data.

Therefore, the Service's non-inclusion of those costs deemed too uncertain or speculative in the total potential incremental cost of the designation and the method used in determining future Section 7 costs are in accordance with the ESA and do not violate the APA.

**F.**     **The Service lawfully acted within its discretion in not excluding areas**.

---

[110]*Bennett*, 520 U.S. at 172 (quoting 16 U.S.C. § 1533(b)(2)).

[111]*Id.*

Case 3:11-cv-00025-RRB   Document 96   Filed 01/11/13   Page 25 of 50

Plaintiffs argue that the Service acted arbitrarily and capriciously when it failed to exclude *all* Alaska Native communities and did not adequately balance the benefits and disadvantages of including areas that Plaintiffs requested be excluded.[112]  This Court disagrees.

Under 16 U.S.C. § 1533(b)(2), the Service *may exclude* any area from critical habitat if it determines that the benefits of such exclusion outweigh the benefits of the area's inclusion. "[T]he Service has *wide discretion* in determining whether to exclude particular areas."[113]  Yet, such determination "can be a delicate balancing act."[114]  Furthermore, like economic impacts, the Service must *only consider* other impacts when deciding whether or not to include an area in the critical habitat designation.[115]

Here, Plaintiffs misread the statute.  The need to balance the benefits of exclusion versus inclusion arises only when the Service decides to exclude an area, not include one.  The ESA leaves the decision to include areas in the designation to the discretion of the Service as long as such areas meet the other requirements of the ESA.  The Service merely needs to show that it considered all of the impacts of the potential designation prior to creating it.  Thus, the Service is not required to show in the record that it carried out a benefits-balancing exercise for each and

---

[112]Docket 56 at 18-20.

[113]*Ariz. Cattle Growers' Ass'n*, 534 F.Supp.2d at 1032 (emphasis added).

[114]*Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1172.

[115]16 U.S.C. § 1533(b)(2).

26

every potential impact to the areas to be designated.  Moreover, the record shows that the Service considered all of the impacts involving the requested exclusions.[116]  Specifically, the Service thoroughly considered the effect of the designation on the relationship between the Alaska Natives and the Service.[117]  Therefore, despite the seemingly unreasonableness of the Service's actions, the Court must be deferential to the weight given by the Service to the impacts of designation.

Plaintiffs point out the Service's incongruity in excluding the Alaska Native villages of Barrow and Kaktovik while not mentioning in the Final Rule the other thirteen villages located within Unit 3.[118]  Plaintiffs' argument is premised on a misunderstanding.  The thirteen villages were never included in the designation in the first place.  "[T]he Service did not include all areas on which there are existing 'manmade structures.'"[119]  The only reason that Barrow and Kaktovik were excluded through discretion and not through textual definition, as were the thirteen villages, is because the North Slope Borough provided the Service with the village district boundaries and the legal descriptions necessary to exclude the two areas, as required by 50 C.F.R. § 424.12(c).[120]  The Service's action in excluding Alaska Native villages from the designation appears to be

---

[116]ARI PBCH0045491-95.

[117]ARI PBCH0045494-95.

[118]Docket 56 at 20.

[119]Docket 64 at 105 (quoting ARI PBCH0045492, PBCH0045514).

[120]ARI PBCH0045492.

Case 3:11-cv-00025-RRB   Document 96   Filed 01/11/13   Page 27 of 50

uniform and not arbitrary. Therefore, the Service passes statutory muster by showing record evidence that it at least *considered all* of the possible impacts of designation, thereby, showing that its actions regarding the requested exclusions are not arbitrary or capricious.

G. **The No-Disturbance Zone contains a proper physical or biological feature**.

Plaintiffs attack the evidence used to support the inclusion of a no-disturbance zone ("NDZ") in Unit 3 as well as call into question the necessity and purpose of such a zone as a feature in the barrier island habitat PCE.[121] However, the Court has determined that, as a part of Unit 3, the NDZ contains a valid feature of the barrier island habitat PCE.

The Service clearly states that the NDZ is one of the areas that comprises Unit 3 and does not stand alone.[122] Further, the Service explains that as a part of the barrier island habitat PCE, the NDZ contains the refuge-from-human-disturbance physical or biological feature.[123] According to 50 C.F.R. § 424.12(b), freedom from human disturbance is a permissible physical or biological feature. Because the NDZ is a part of Unit 3, it can remain in the designation as long as it contains at least one feature essential to the conservation of the polar bear, which it does. Additionally, it does not matter that other parts of Unit 3 also contain the refuge-from-human-disturbance feature. As long as each part of a unit contains at least one feature of a PCE,

---

[121]Docket 77 at 18-21.

[122]Docket 64 at 61.

[123]*Id.*

28

the entirety of the unit can be designated as critical habitat, and each part of a unit can possess *more than one feature*.

The Service set the width of the NDZ at one mile. Plaintiffs opine that the study used to determine the width of the NDZ was faulty and not applicable in Unit 3.[124] The record proves otherwise. When delving into the realm of an agency's expertise, a court "must defer to the agency's *interpretation* of complex scientific data."[125] Here, the Service adequately considered the contrary opinions of additional experts regarding the distance needed to not disturb the polar bear[126] and, through its own expertise, came to the conclusion that a one mile zone would be required.[127] The Court will defer to the Service's interpretation of the data concerning the correct no-disturbance distance for polar bears. The Court will also defer to the Service concerning the Plaintiffs' contention that the NDZ is only effective for female polar bears and their cubs. The Service considered many factors and reasonably concluded that the NDZ was still necessary for all polar bears in the area.[128] Therefore, the NDZ is a valid part of Unit 3 and the barrier island habitat PCE, and its inclusion is neither arbitrary nor capricious.

---

[124]Docket 51 at 54.

[125]*Nw. Ecosystem Alliance*, 475 F.3d at 1150.

[126]Docket 64 at 63-64.

[127]ARI PBCH0045488.

[128]The Service adequately supports its reasons for establishing the NDZ in light of the fact that different polar bears react differently to human disturbance. ARI PBCH0016561, PBCH0016566-68, PBCH0050212, PBCH0047392.

29

## H.    __The Service's treatment of the prudency of the designation is lawful__.

Plaintiffs argue that the Service failed to make a prudency finding prior to creating the designation.[129]  Alternatively, Plaintiffs claim that if the Service *did* make a prudency finding, it was not based on the best available scientific data and did not appropriately weigh the benefits and disadvantages of designation.[130]  The Court disagrees with both of Plaintiffs' contentions.

Under 16 U.S.C. § 1533(a)(3)(A)(i), the Service shall designate critical habitat "to the maximum extent *prudent* and determinable . . . ."[131]  Critical habitat designation "is not prudent when . . . [s]uch designation of critical habitat *would not be beneficial* to the species."[132]  The plain language of the statute and the regulation clearly show that the "prudent" factor in designating critical habitat merely sets the outer bounds in determining areas to designate.  The Court cannot find a requirement in the ESA or in its enforcing regulations that obliges the Service to expressly find, and to so state in the Final Rule, that the designation was prudent from the outset.  Generally, the Service's decision concerning the prudency of a designation is implied with the continuation and completion of such designation.  In contrast, it *is* necessary for the Service to expressly justify its actions when it finds designation to *not be prudent*, which is not

---

[129]Docket 56 at 37.

[130]*Id.* at 38.

[131]Emphasis added.

[132]50 C.F.R. § 424.12(a)(1)(ii) (emphasis added).

30

the case here.[133]   Thus, Plaintiffs' contention that the Service had to show in the record that it expressly made a prudency finding is unfounded and unconvincing.

Next,  Plaintiffs claim that if the Service made a prudency finding prior to the creation of the critical habitat, it did so based on outdated evidence from 2008.[134]  Yet, Plaintiffs fail to show any alternative evidence that would constitute the best available scientific data concerning the prudency of the designation.[135]

Finally, Plaintiffs opine that the designation is not prudent because there will be no benefit to the polar bear from such designation and because the adverse consequences to the relationship between the Service and the Native Alaskans will be prohibitively severe.[136]  The Court disagrees.  The benefits of designation, although arguably generic and insubstantial, are clearly laid out in the Final Rule.[137]  Such benefits are in addition to and exclusive of any protections currently offered by the Marine Mammal Protection Act or by any other state or federal regulations presently safeguarding the polar bear.  When reviewing the potential benefits of designation, a court *cannot* consider the measures already in place for the protection of the

---

[133]50 C.F.R. § 424.12(a).

[134]Docket 56 at 38.

[135]*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004) (citing *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989)).

[136]*Id.* at 40.

[137]ARI PBCH0045488, PBCH0045520.

31

species.[138]  Also, the Court has already addressed the designation's impact on the Service-Native relationship.  *Supra* Discussion § F.

Therefore, in light of the absence of a duty on the part of the Service to expressly show its prudency finding, and with sufficient evidence in the record showing the benefits of designation, Plaintiffs' prudency argument fails.

I.     __The Service cooperated with the State to the maximum extent practicable__.

Plaintiffs claim that the Service failed to fully comply with its statutory duty to cooperate with the State to the maximum extent practicable, including consulting with the State prior to designating critical habitat.  However, Plaintiffs erroneously interpret the Service's cooperation obligations.

The ESA outlines the Service's duties concerning cooperation with states and state agencies in designating critical habitat.  Generally, the Service must give notice of the proposed rule to all affected parties and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."[139]  However, when the interested party is a state, the Service must cooperate

---

[138]*See Natural Res. Def. Council v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1127 (9th Cir. 1997).

[139]5 U.S.C. § 553(c) (1966).

with the state "to the maximum extent practicable[,] "[140] including "giv[ing] actual notice of the proposed regulation to the State agency in each State in which the species is believed to occur . . . and invite the comment of such agency . . . ."[141]

Here, the Service has defined the ambiguous phrase "maximum extent practicable" to mean using the expertise and soliciting the information of state agencies in preparing proposed and final rules to designate critical habitat.[142] As the Court owes deference to the Service's interpretation of its own regulations, the Court accepts the Service's definition.[143] Based on such definition, the Court finds ample support in the record that the Service fulfilled its statutory duty to cooperate with the State to the maximum extent practicable. For example, the Service: held public meetings at the behest of the State;[144] consulted with the State through the Service's contractor, Northern Economics;[145] and alerted the State to *every* opportunity to participate in the critical-habitat-designation process.[146] Although Plaintiffs may deem the Service's cooperation

---

[140]16 U.S.C. § 1535(a) (1988).

[141]16 U.S.C. § 1533(b)(5)(A)(ii); *accord* 50 C.F.R. § 424.16 (2012).

[142]Docket 64 at 117 (internal quotations omitted).

[143]*Nat'l Ass'n of Home Builders*, 551 U.S. at 672 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)) .

[144]ARI PBCH0032310, PBCH0032438.

[145]ARI PBCH0022882.

[146]ARI PBCH0045555.

Case 3:11-cv-00025-RRB   Document 96   Filed 01/11/13   Page 33 of 50

to be of little real significance in the final production of the designation, the Court does not find any instance in the record in which the Service does not comply with its relatively non-demanding maximum-extent-practicable interpretation.

Additionally, Plaintiffs raise the issue of whether or not the Service fulfilled its obligation to *consult* with the State. Plaintiffs cite 16 U.S.C. § 1536 and the latter half of 16 U.S.C. § 1533(b)(5)(A)(ii) in support of its contention that the Service failed to properly consult with the State prior to creating the Final Rule. However, the statutory language used by Plaintiffs is not applicable in this case. First, 16 U.S.C. § 1536 covers the ESA's Section 7 consultations, and the section of 16 U.S.C. § 1536 that requires consulting with states, refers to the duty of federal agencies to consult with affected states before taking any action on areas *already designated as critical habitat*. The consultation requirement in 16 U.S.C. § 1536 does not apply to the initial creation of the critical habitat designation and thus does not apply here. Likewise, the case cited by Plaintiffs, *California Wilderness Coalition v. United States Department of Energy,* is based on an action under 16 U.S.C. § 1536 and does not support Plaintiffs' claim that the Service was obligated to consult with the State.

Second, the latter part of 16 U.S.C. § 1533(b)(5)(A)(ii) applies *only* when the Service seeks to "acquir[e] any land or water, or interest therein, for the purpose of conserving any endangered species or threatened species." As the Service is not attempting to *acquire* any land, water, or interest therein, the state consultation requirement of 16 U.S.C. § 1533(b)(5)(A)(ii) is

34

not invoked.

Therefore, the Service fulfilled its statutory obligation to cooperate with the State in the designation of polar bear critical habitat, but was not specifically required to consult with the State during such process. The Service did not violate ESA procedural requirements and thus did not run afoul of the APA.

**J.       The Service had no duty to consult with Alaska Native Corporations**.

Plaintiffs claim that the Service failed to sufficiently consult with the Alaska Natives during the process of developing the Final Rule, relying on the Consolidated Appropriations Act, Pub. L. No. 108-447, § 518, 118 Stat. 2809 (2004), in conjunction with Executive Order 13175, 65 Fed. Reg. 67,249, 67,252 (Nov. 6, 2000).[147] Plaintiffs argue that the Service has a duty to consult with the Alaska Natives, as the Service has with Indian Tribes, prior to the formal promulgation of a regulation that has tribal implications and imposes substantial direct compliance costs on Alaska Natives.[148]

Even though the executive order requires all federal agencies to consult with Alaska Natives prior to finalizing a regulation that would affect such people, the requirement *only* applies to regulations that are "*not required by statute*." Here, the Service has made it abundantly clear that the designation of critical habitat for a species that is listed as threatened or

_____

[147]Docket 56 at 28.

[148]*Id.*

35

endangered under the ESA is *required by statute*.[149]  Because the designation of critical habitat

here is statutorily mandated, the consultation requirement of Executive Order 13175 does not

apply.  Thus, because the Service was not required to consult with Alaska Natives to a greater

extent than any other interested party, it did not violate the procedural requirements of the ESA.

### K.    The Service's designation does not comply with 16 U.S.C. § 1532(5)(A)(i).

According to 16 U.S.C. § 1532(5)(A)(i), critical habitat for a threatened species

comprises those "*specific areas* within the geographical area occupied by the species, at the

time" the species is listed as threatened, "*on which are found those physical or biological*

*features*" that are "essential to the conservation of the species and which may require special

management considerations or protection."  Such features may include, but are not limited to:

> (1) Space for individual and population growth, and for normal behavior; (2) Food, water, air, light, minerals, or other nutritional or physiological requirements; (3) Cover or shelter; (4) Sites for breeding, reproduction, rearing of offspring . . . ; and generally, (5) Habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species. [The Service should] . . . focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species. Known primary constituent elements shall be listed with the critical habitat description. Primary constituent elements may include, but are not limited to, the following: . . . feeding sites, seasonal wetland or dryland, water quality or quantity, . . . geological formation, vegetation type, [and] tide . . . .[150]

"[A]reas outside of the geographical area occupied by the species at the time" of listing are to be

---

[149]Docket 64 at 127 (quoting 16 U.S.C. § 1533(a)(3)(A)).

[150]50 C.F.R. § 424.12(b) (2012).

36

included in a critical habitat upon the Service's determination "that such areas are essential for the conservation of the species."[151]

        **1.**        **The record lacks evidence of physical or biological features in Unit 2**.

The Service states that "the terrestrial denning habitat PCE includes not just the specific areas where polar bears literally create dens, but also necessarily includes access to and from those den sites, freedom from disturbance, and space for sows to acclimatize newly emerged cubs."[152] Despite having clearly defined the terrestrial denning habitat PCE, the Service has failed to show clear support in the record for all but one of the PCE features.

Although a reviewing court must be deferential to agencies and presume valid their actions, agencies must still show substantial evidence in the record[153] and clearly explain their actions.[154] Specifically, in order for an area to be designated as critical habitat, an agency must determine that the area actually contains physical or biological features essential for the conservation of the species.[155] An agency cannot simply speculate as to the existence of such

---

[151]16 U.S.C. § 1532(5)(A)(ii) (1988).

[152]Docket 64 at 54.

[153]*Universal Camera Corp.*, 340 U.S. at 488.

[154]*Atchison T. & S. F. Ry. Co.*, 412 U.S. at 807.

[155]16 U.S.C. § 1532(5)(A)(i).

features.[156]

The Service specifically defined the terrestrial habitat PCE, found in Unit 2, as being comprised of the following component parts: (1) den sites, "[s]teep, stable slopes (range 15.5-50.0°), with heights ranging from 1.3 to 34 m (4.3 to 111.6 ft), and with water or relatively level ground below the slope and relatively flat terrain above the slope"; (2) "unobstructed, undisturbed access between den sites and the coast"; (3) "sea ice in proximity of terrestrial denning habitat prior to the onset of denning during the Fall to provide access to terrestrial den sites"; and (4) "the absence of disturbance from humans and human activities that might attract other polar bears."[157]  The Service explained that each of these components is a physical or biological feature that had to be located, on a macro scale, within the whole of Unit 2 at the time of listing in order for the area to be designated as critical habitat.[158]  For example, the Service *did not* include in Unit 2 the terrestrial denning habitat in western Alaska because the area "lack[ed] the 'access via sea-ice' component of the terrestrial denning habit PCE that is *necessary for including in critical habitat*."[159]  The Service clarified, however, that  "[t]he fact that any single area may be suitable for only one of these functions does not mean that the designated area does

---

[156]*See Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1163-64.

[157]ARI PBCH0045510.

[158]*See* Docket 64 at 56.

[159]ARI PBCH0045509 (emphasis added).

38

not [as a whole] contain the features essential to polar bear denning."[160]  Thus, in order to be designated as critical habitat, the entirety of Unit 2 had to have located within it at least one of the above-mentioned features.  The Service, however, fails to show, and the record does not contain, evidence of such features save the first and third (den sites and sea ice access), and support for the third feature is vague and confusing .

Unit 2 covers a section of northern Alaska that extends west from the United States-Canada border to the Kavik River and extends from the coast to 20 miles inland and then extends west from the Kavik River to the town of Barrow, Alaska and extends from the coast to five miles inland.[161]  In order to define the dimensions for Unit 2, the Service relied on a United States Geological Survey Administrative Report titled *Polar Bear Habitat in Alaska: Inland Extent of Maternity Denning and Graphics Showing Observed and Predicted Changes in Offshore Optimal Habitat.*[162]  The results of such report were that "[n]inety-five percent of polar bear dens that were observed on the mainland in the Canada to Kavik region occurred within 18.6 miles of the coast . . . [and] [i]n the Barrow to Kavik region, 95% of dens occurred 2.8 miles from the coast . . . ."[163]  Relying on this information, the Service determined that Unit 2 covered ninety-

---

[160]*Id.*

[161]Docket 64 at 26.

[162]ARI PBCH0007518-26.

[163]ARI PBCH0007522.

five percent of all historical confirmed and probable dens east of Barrow.[164]

Based *solely* on the location of the confirmed or probable den sites, the Service concluded that the whole of Unit 2 contained *all* of the physical or biological features necessary for the terrestrial denning habitat PCE.[165] While the record evidence can be used to show the existence of the first and maybe third of the necessary features, the evidence is entirely lacking in support for the second and fourth features outlined by the Service, namely "unobstructed, undisturbed access between den sites and the coast" and "the absence of disturbance from humans and human activities that might attract other polar bears."[166]

The Service points to two other studies to show that all of the essential features were found in Unit 2, but such studies only confirm that the first feature is found in roughly one percent of the entire area designated.[167] Thus, the Service has identified physical or biological features in approximately one percent of Unit 2, but fails to point to the location of any features in the remaining ninety-nine percent.

_____

[164]ARI PBCH0045515.

[165]ARI PBCH004591 ("We . . . believe that the methods used, including the use of the 95 percent of maternal dens located by telemetry and verified as confirmed or probable . . . , accurately capture the major denning areas *and, therefore, the features essential to polar bear denning habitat*." Emphasis added).

[166]ARI PBCH0045510.

[167]ARI PBCH0045508 (Service cites Durner 2001 and 2006 studies at PBCH0048587 and PBCH0048675, respectively).

40

The Service's lack of evidence and explanation concerning the second and fourth features is especially stark concerning the inclusion of the areas around Deadhorse, Alaska, as such area is rife with humans, human structures, and human activity.[168]  The Service explains that while each portion of Unit 2 does not have to contain all of the four required features, "the Service *could* find that these areas adjacent to human activity provide access between den sites and the sea ice . . . ."[169]  By conceding that the Service included the areas around Deadhorse merely because the agency *could* find that such areas contained one of the four essential features, the Service suggests that it had not, at the time of listing or at the time of its briefing, established that *any* of the required features existed in such areas, thereby, violating the requirement that essential features be found in areas *before* designating them as critical habitat.

Even the support for the third feature is tenuous and in need of clarification: "The common feature[] in *many* of the dens in these areas w[as] the presence of sea ice within 16 km (10 mi) of the coast . . . ."[170]  The Service and the record fail to explain *which* dens are within ten miles of the coast and how close to the coast are the dens *not* within ten miles.  Furthermore, the Service contrarily states in its opposition brief "that it would *not be possible for a den site to*

---

[168]*See* Docket 51 at 22 n. 23.

[169]Docket 64 at 60.

[170]ARI PBCH0045515 (emphasis added).

41

*also . . . provide access to the sea ice."*[171]  The inclusion of such evidence in the Final Rule would be superfluous if not to show access between dens and sea ice; yet, the Service's own words belie such explanation and further add to the ambiguity already present in the record concerning the required access-to-sea-ice feature of the denning habitat PCE.

The Service attempts to explain its lack of specificity regarding essential features in Unit 2 by claiming that "the Service cannot define and is not required to define a patchwork matrix of denning habitat on a micro scale . . . ."[172]  Regardless of the procedure used by the Service for its designation, the statute is clear: The *specific* areas designated as critical habitat *must* contain physical or biological features essential to the conservation of the species at the time of listing.[173] Here, there is no way to know if ninety-nine percent of Unit 2 contains the essential features because there is no evidence in the record or cited by the Service that shows where such features are located.  Moreover, the question of whether or not the Service used the best scientific data available is premature as there is no clear scientific evidence to review regarding three of the four essential features or components of the terrestrial denning habitat PCE.  The Service lists reasons why it does not have to specify the location of all four features, but such justifications do not make up for the lack of clear record evidence supporting even the existence of three of the four

---

[171]Docket 64 at 57 (emphasis added).

[172]Docket 64 at 55.

[173]16 U.S.C. § 1532(5)(A)(i).

42

essential features in Unit 2.[174]

**In short, the Service cannot designate a large swath of land in northern Alaska as "critical habitat" based entirely on one essential feature that is located in approximately one percent of the entire area set aside. The Service has not shown and the record does not contain evidence that Unit 2 contains all of the required physical or biological features of the terrestrial denning habitat PCE, and thus the Final Rule violates the APA's arbitrary and capricious standard**.

2.     **The record lacks evidence of physical or biological features in Unit 3**.

Unit 3 of the Service's critical habitat designation "includes all barrier islands along the Alaska coast and their associated spits, within the range of the polar bear in the United States, and the water, ice, and terrestrial habitat within 1.6 km (1 mi) of these islands (no disturbance zone)."[175]  The barrier island habitat PCE, in Unit 3, is comprised of three features or components: (1) denning habitat; (2) refuge from human disturbance; and (3) access along the coast to maternal den sites and optimal feeding habitat.[176]  Each of these components is a

---

[174]In the alternative, the Service argues that the proximity inclusion exception of 50 C.F.R. § 424.12(d) applies here to include all of the area designated in Unit 2.  The Court finds that such regulation is not applicable.

[175]ARI PBCH0045510.

[176]*Id.*; Docket 64 at 61.

biological or physical feature essential to the conservation of the polar bear.[177]  Like the individual areas of the terrestrial denning habitat PCE, each part of the barrier island habitat PCE does not have to contain all three of the required features, only one.[178]  For example, the Service "recognize[s] that not all barrier islands have suitable denning habitat."[179]

The Final Rule clearly delineates the location of the first and second features in Unit 3.[180]  "Barrier islands that have been used multiple times for denning include Flaxman Island, Pingok Island, Cottle Island, Thetis Island, and Cross Island . . . and the no-disturbance zone (area extending out 1.6 km (1 mi) from the barrier island mean high tide line)."[181]  However, the explanation of the location of the other essential feature is lacking.  "Polar bears regularly use barrier islands to move along the Alaska cost as they traverse across the open water, ice, and shallow sand bars between the islands . . . and to move along the coast to access den sites or preferred feeding locations."[182]  The Service does not explain where on the islands and associated spits the polar bears move to access den sites and preferred feeding habits.  Again, areas designated as critical habitat *must* contain physical or biological features essential to the

---

[177]*See id.* at 61-62.

[178]*Id.* at 61.

[179]ARI PBCH0045494.

[180]ARI PBCH0045509-10.

[181]*Id.*

[182]*Id.*

conservation of the species at the time of listing.[183]  Without even minimal evidence in the record

showing *specifically* where all the physical or biological features are located within an area, the

area cannot be designated as critical habitat.  Although each part of Unit 3 does not have to

contain each of the three essential features, *every part* of the designation must have at least

one.[184]  Despite the record showing where the first and second features are located, it is unclear to

the Court whether the third feature is even found in the area.  Without such feature, Unit 3 cannot

be considered critical habitat within the definition of the barrier island habitat PCE.

**Therefore, the Service has not shown, and the record does not contain, evidence that
Unit 3 contains all of the required physical or biological features of the barrier island
habitat PCE, and thus the Final Rule violates the APA's arbitrary and capricious standard.**

**L.**      **The Service failed to provide the State with adequate justification.**

The Service explains that its responses to the State of Alaska regarding the State's

comments that were not adopted in the Final Rule complied with the procedural requirement set

out in 16 U.S.C. § 1533(i) and 50 C.F.R. § 424.18(c).[185]  This Court disagrees.

 Because questions involving the Service's response to state agency comments are

procedural issues, the Court's review differs from that under the arbitrary and capricious

---

[183]16 U.S.C. § 1532(5)(A)(i).

[184]16 U.S.C. § 1532(5)(A)(i).

[185]Docket 64 at 109.

45

standard.  A court is "limited to ensuring that 'statutorily prescribed procedures have been followed . . . .'"[186]  Indeed, "'regulations subject to the APA cannot be afforded the force and effect of law if not promulgated pursuant to the statutory procedural minimum found in that Act.'"[187]  The Court here does not analyze the sufficiency of the Service's justifications for its responses to Alaska State Fish and Wildlife Management Agency's ("ADF&G") comments, which is given over to Service discretion, only the procedure the Service followed in carrying out its responses.

On December 10, 2010, after the creation of the Final Rule, the Service sent a letter ("response letter") to Governor Sean Parnell outlining the Service's responses and explanations to the State's comments not adopted in the Final Rule.[188]  Although the Service made an effort to comply with ESA response procedures regarding states, the Service fell short of full compliance.

According to 16 U.S.C. § 1533(i) and 50 C.F.R. § 424.18(c), when a state agency "submits comments disagreeing in whole or in part with a proposed rule, and the [Service] issues a final rule that is in conflict with such comments, . . . the [Service] *shall provide such agency with a written justification for the failure to adopt a rule consistent with the agency's comments* .

---

[186]*Kern County Farm Bureau*, 450 F.3d at 1075-76 (quoting *Natural Res. Def. Council*, 279 F.3d at 1186).

[187]*Western Oil & Gas Ass'n*, 633 F.2d at 812-13 (quoting *Chrysler Corp.*, 441 U.S. at 313).

[188]ARI PBCH0045553-45562.

46

. . .”[189]

First, it is clear from the fact that Congress established a *separate procedure* to respond to state agency comments, as opposed to comments from other affected parties, that Congress envisioned a *separate duty* on the part of the Service to specifically respond to those state comments not adopted in a final rule. Indeed, the statute clearly requires that *after* a final rule is issued, the Service must provide a *separate* written justification to the state agency responsible for the comments not used in the final rule.[190] Thus, the Service's statement that adequate responses to the State's unused comments could be found *in part in the Final Rule itself* is directly contrary to ESA procedure.[191] By not including in the response letter *all* its responses to the State's comments not ultimately included in the Final Rule, the Service did not fulfill its response obligations under the ESA.

Second, ADF&G submitted the comments concerning the proposed critical habitat designation, not Governor Sean Parnell.[192] A correct response letter from the Service would have been sent to the Alaska state agency who submitted the comments to the designation as is required.

---

[189]Emphasis added.

[190]16 U.S.C. § 1533(i); 50 C.F.R. § 424.18(c).

[191]Docket 64 at 111-13.

[192]Docket 58 at 28.

47

Accordingly, each of the Service's responses to the State's comments had to be contained in the response letter or in another written response sent specifically to the ADF&G.[193] Therefore, the Court finds that the Service deviated from proscribed procedure in responding to the State of Alaska's comments and ran afoul of the ESA.

In sum, the substantive errors that the Court finds to be arbitrary and capricious, in violation of the APA, are: (1) *the record lacks evidence of physical or biological features in Unit 2*; and (2) *the record lacks evidence of physical or biological features in Unit 3*. *Supra* Discussion § K. Additionally, *the Service failed to follow applicable ESA procedure by not providing the State with adequate justification for the State's comments not incorporated into the Final Rule*. *Supra* Discussion § L.

V. **CONCLUSION**

The Supreme Court has determined that agency actions found to be arbitrary and capricious are to be remanded to the originating agency.[194] Additionally, those actions that fail to meet procedural requirements shall also be remanded.[195] Moreover, where agency action fails "to

---

[193]AK's comments to potentially be addressed by Service: ARI PBCH0026247-73; PBCH0032495-518; PBCH0044627-74; PBCH0032512-17; PBCH000032509-11; PBCH0054966-5033; and PBCH0032502-08.

[194]*Nat'l Ass'n of Home Builders*, 551 U.S. at 657-58.

[195]*F.C.C. v. NextWave Pers. Communic'ns Inc*., 537 U.S. 293, 300 (2003) (quoting *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 413–14).

48

follow Congress's clear mandate the appropriate remedy is to vacate that action."[196]  "[V]acatur of an unlawful agency rule normally accompanies a remand."[197]

After reviewing the voluminous pages of case law pertaining to the legally required consequence of an agency action found to be arbitrary, capricious, and procedurally errant, and in light of the seriousness of the Service's errors, the Court hereby sets aside the Final Rule.[198]  The Court does not hand down this judgment lightly, but only after careful consideration of all the law and facts involved with this critical habitat designation.  There is no question that the purpose behind the Service's designation is admirable, for it is important to protect the polar bear, but such protection must be done correctly.  In its current form, the critical habitat designation presents a disconnect between the twin goals of protecting a cherished resource and allowing for growth and much needed economic development.  The current designation went too far and was too extensive.

Therefore, Plaintiffs' Motions For Summary Judgement at **Docket Numbers  50**, **55**, and **57** are hereby **GRANTED**, and the Final Rule shall be **VACATED** and **REMANDED** to the Service to correct the aforementioned substantive and procedural deficiencies.

**ORDERED** this 10th day of January, 2013.

---

[196]*Cal. Wilderness Coal.*, 631 F.3d at 1095.

[197]*Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1185-86 (9th Cir. 2004).

[198]Designation of Critical Habitat for the Polar Bear (Ursus maritimus) in the United States, 75 Fed. Reg. 76,086 (Dec. 7, 2010).

S/RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE